ANA MARÍA ORTIZ, ETC., Plaintiff and Appellant, *v.* SILVESTRE DRAGONI, Defendant and Appellee.

No. 8297.   Argued June 4, 1941.—Decided June 24, 1941.

*Frank Torres* for appellant.   *R. Hernández Matos* for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

This is an appeal from a judgment for defendant in an

action of filiation, brought under subdivisions 2 and 3 of Section 125 of the Civil Code (1930 ed.), which provides that the father is obliged to recognize the natural child: "(2) Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family;" or "(3) When the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child."

The four errors assigned by the appellant are actually reduced to two. In the first three assignments error is charged for the failure to hold that the evidence submitted was sufficient to sustain the complaint, and in the fourth it is charged that the trial court was moved by passion, prejudice, and bias.

The nature of the errors assigned requires a summary of the evidence.

The witnesses for the plaintiff were: her mother Dolores Ortiz, her uncle Guillermo Ortiz, and Manuel Borrero, Marcolina Heredia, and Juan Vázquez. Lorenzo Dragoni testified for the defendant.

Dolores Ortiz testified that she is unmarried and that the defendant Silvestre Dragoni is also unmarried; that she knew defendant in 1934 in the ward of Maragüez, Ponce, while working in the home of doña María Dragoni, an aunt of Silvestre; that the defendant was also living in Maragüez, some distance from the home of doña María; that defendant made love to her and proposed marriage to her, and that one night, while the witness was in her room with the door left open defendant went in and had sexual intercourse with her; that this happened four or six times but that on the witness becoming pregnant defendant ceased visiting her; that three months before childbirth she moved to the home of her sister Alejandrina Ortiz and during those three months the defendant did not call on her, the child having been born

in the home of her aforesaid sister; that eight days after the birth of the child, a daughter, defendant came to see her and left $2, and that ever since defendant has not called again on the witness; that witness has always taken care of her daughter.

Guillermo Ortiz testified that he is a brother of Dolores and knows the defendant; that the latter on two occasions told him that he had a love affair with his sister and that he meant to marry her; that eight days after the birth of the plaintiff, the defendant came to see her and left $2 for her. In disagreement with the statements of Dolores Ortiz and Marcolina Heredia, this witness asserted that on that occasion, that is, when appellee came to see his daughter eight days after her birth, his sister Dolores was not at home but in the ward of Maragüez; that the only people present there at the time were Alejandrina Ortiz, a sister of Dolores and of the witness, the child, another woman (who we suppose was Marcolina Heredia), and the witness; that afterwards the defendant discontinued his visits; that on a certain occasion, while the witness was in the house of Francisco Taboada, Lorenzo Dragoni, an uncle of defendant, in front of Tomás Monllor, called a sister-in-law of the witness and handed her $10 for the support of the child Ana María Ortiz.

Manuel Borrero testified that he is plaintiff's godfather; that once he met the defendant and the witness addressed him as *"compadre"* and told him that it was his duty to do something for the girl and for the mother, and the defendant retorted that he had offered $100 but that she had refused and that he would not given her more.

Marcolina Heredia testified that about eight days after the plaintiff was born, the witness was visiting Dolores Ortiz and the defendant arrived there and wanted to see his daughter Ana María Ortiz and, entering the room, took and fondled her, calling her "my daughter," and said, "My visit

will be short because I have to do some errands.'' That he placed the girl on the bed and gave the mother $2 for food for the child.

This witness testified with absolute certainty that her visit took place on April 6, 1937, although she took the stand on January 30, 1940, and when asked how she could remember with so much precision the date of the visit, she said that because she knew it, that she had not made any note of it; that she had it in her mind.

Juan Vázquez only stated that he knows Dolores Ortíz and that she is unmarried.

The evidence for the plaintiff consisted of the above testimony and of the birth certificate of the child.

The evidence for the defendant, as we have already stated, consisted of the testimony of Lorenzo Dragoni who denied having sent any money to the plaintiff.

Is the evidence above recited sufficient to sustain a judgment of filiation based on either of the two grounds alleged?

The only act tending to show the status of the plaintiff as a natural daughter was the call made by the defendant eight days after her birth, when he had fondled her and left her $2 for her support, although he never thereafter took any notice of the girl or of the mother. It is true that Manuel Borrero testified that on one occasion he met the defendant and addressed him as *"compadre,"* and advised him to do something for the plaintiff and her mother, and that the defendant had answered that he had offered $100 to Dolores Ortiz, that the latter had refused, and that he would give her no more. Apart from the fact that from such testimony it can not be determined whether the $100 offer was made before the birth of the child, and if so made the offer could not be considered as an act of acknowledgement the existence of said offer is extremely questionable, for, if on the occasion above referred to, the defendant, eight days after the birth of the child, handed to the mother $2 for support which

the latter accepted, how could she possibly refuse the sum of $100, especially a destitute woman like Dolores Ortiz?

Such a weak evidence as that adduced by the plaintiff fails to show, in our judgment, that the latter had uninterruptedly enjoyed the status of natural daughter of the defendant, as required by law, in order to compel the father to acknowledge her. Construing the term "uninterruptedly" (*continuo*) which appears in subdivision 2 of section 125 already cited, this court, in *Colón* v. *Heirs of Tristani*, 44 P.R.R. 163, 173, has said:

" . . . . The adjective '*continuo*,' according to Scaevola, has several meanings and in the case of section 135 it may not be taken to mean 'uninterrupted,' but as 'a thing that follows another,' and it is to be interpreted with the word 'constant,' which means perseverance or repetition of acts. In our opinion, the word '*continuo*' (uninterrupted) should be taken to mean a series of acts, a set of facts carried out by the person from whom the acknowledgment is claimed, sufficient, if considered as a whole, to constitute the uninterrupted condition of a natural child. Once these series of acts have been carried out for a reasonable length of time, the father should not be allowed to revoke with his subsequent acts the acknowledgment priorly made by him."

■ Nor is there any evidence tending to show that the defendant and Dolores Ortiz lived in concubinage at any time. It only appears from the testimony of Dolores Ortiz that she had sexual intercourse with the defendant four or six times in the room occupied by her in the home of María Dragoni, where she worked as a servant, and that subsequent to those acts the defendant only called on her again on the occasion of the visit to the child eight days after the latter was born. Under such circumstances, there is no basis to justify the conclusion that they ever lived in concubinage.

It does not appear from the record that the trial judge acted in this case under the influence of passion, prejudice, or partiality. It is the duty of every attorney to raise in the defense of his client any question that might be pertinent

and based on the truth; but, in our judgment, it is not proper to make such charges as those set up in the instant case where their is not the slightest evidence to support them but, on the contrary, the record shows that the judge acted with the strictest impartiality.

As none of the errors assigned exists, the judgment appealed from should be affirmed.

Mr. Chief Justice Del Toro, dissenting.

This is an appeal taken by Ana María Ortiz, a minor, represented by Dolores Ortiz, her mother with *patria potestas* over her, from a judgment rendered by the District Court of Ponce dismissing the action brought by her against Silvestre Dragoni, in which she sought to be declared by that court an acknowledged natural daughter of the defendant.

It is alleged in the complaint that the plaintiff "is the issue of the love and carnal relations that had existed between her mother with *patria potestas*, Dolores Ortiz, and the defendant, Silvestre Dragoni"; that the plaintiff was born on March 29, 1937, in Ponce, and her parents both at the time of her birth and of her conception were unmarried and were known to be living in concubinage; and that the defendant had publicly and privately acknowledged his paternity.

The applicable legal provision is to be found in Section 125 of the Civil Code (1930 ed.), similar to Section 193 of the Civil Code of 1902, as amended by the Act of March 9, 1911, (Session Laws, p. 234), and which in its pertinent part reads as follows:

"Natural children are those born out of wedlock, from parents who, at the moment when such children were conceived or were born, could have intermarried with or without dispensation.

"The natural child may be recognized by the father and mother conjointly or by one of them only either in the record of birth or in the testament or in any other public instrument.

"The father is obliged to recognize the natural child:

" *       *       *       *       *       *       * "

"2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family.

"3. When the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child.

" * * * * * * * "

The defendant denied that he had any love or carnal relations with the mother of the plaintiff; that the latter was his daughter; or that he had acknowledged her as such.

The case went to trial, and the court, on June 13, 1940, rendered the judgment appealed from. In its statement of the case and opinion, after referring to the pleadings and the law, the court said:

"To our mind, the evidence submitted by the plaintiff fails to sustain her contention. Dolores Ortiz, mother with *patria potestas* over Ana María Ortiz, defeated her theory with her own testimony."

It then went on to analyze the evidence introduced, and concluded as follows:

"Nor does the evidence adduced warrant us in considering the plaintiff Ana María Ortiz as having been in the uninterrupted possession of the status of a natural child of Silvestre Dragoni, justified by the conduct of the father himself or that of his family.

"To our mind, it was not proved, either, that Dolores Ortiz was known to have lived in concubinage with the defendant Silvestre Dragoni during her pregnancy or at the time of the birth of Ana María."

As it was logical, in accordance with the above conclusions, the court rendered judgment for the defendant, with costs.

Feeling aggrieved by that decision, the plaintiff appealed. She has assigned in her brief four errors, all of which relate to the weighing of the evidence. In order to determine the appeal, we must, therefore, proceed to a consideration of the evidence.

The first witness to testify was the mother, Dolores Ortiz. She stated that she was unmarried; that the girl she held

in her arms was named Ana María Ortiz, aged two years and ten months, and was her daughter, born in Ponce on March 29, 1937, and that her father was defendant Silvestre Dragoni, whom she pointed out in the courtroom; that she knew Dragoni in 1934 in the home of Doña María Dragoni, in the ward of Maragüez, Ponce, where she worked as a laundress and cook; that she slept in a room of the house; that the defendant was living with his family, in the Maragüez Estate, at some distance; that "he courted me; in 1935 he made love to me and promised to marry me; that it was then, on a certain day or rather on a certain night, while I was in my room, he took advantage of the occasion, left a door of my room unlocked entered the room and debauched me."

That she had sexual intercourse with him "once"; that Dragoni was unmarried and so was she; "that he promised to buy me a house and marry me"; "on becoming pregnant I informed him, Silvestre Dragoni, that I had nowhere to go and live, and he said to me: 'Go and live in your sister's home, that as soon as I come into an inheritance from my father I will buy you a house and marry you.'" This happened while she was pregnant, the issue of such pregnancy being Ana María Ortiz.

To the following question put by defendant's counsel: "Did you become pregnant the first night?" she answered: "No, sir, he used to call. I became pregnant on June 28, 1936. The first time he left my room unlocked and took advantage of it. The room had two doors. He caught me sleeping. I am not even to blame . . . He did not come any more as soon as I became pregnant."

During her pregnancy she went to live in the home of her sister, Alejandrina Ortiz, at 160 Mayor Street, Ponce. She gave birth there and about eight days afterwards the defendant called at the house. "As she was his daughter, he came to see her," and left her $2. Thereafter she has supported her daughter. "I have to sew in order to support her. I

myself provide for her milk and clothes. As for medicines, as I registered her in the Health Clinic, they supply me with medicines.''

To questions put to her by defendant's counsel, she answered that she complained to the district attorney. ''I called, but they ignored me; as no attention was paid to me, I did not call again.'' That she had the defendant prosecuted for abandonment of children in the municipal court and he was sentenced. Then counsel for plaintiff intervened and said: ''That is immaterial. I fail to see why . . . .;'' Defendant's counsel said: ''We withdraw the question.'' The judge said: ''Question withdrawn and stricken out.''

Manuel Borrero, upon being called to testify, stated that he knew the defendant and Dolores Ortiz; that the plaintiff was his godchild. He lived next to where she was born and her mother asked him ''whether his wife and himself would do her the favor of sponsoring the child's baptism'' and that they did it with pleasure. That subsequent to the child's birth he met the defendant and addressed him as *''compadre''* and explained to him the situation of the woman and the child. ''I said to him: 'You ought to do something for that woman,' to which he answered that he had offered her one hundred dollars but that she had refused, and that he would give her nothing.''

The question, ''Did you talk about the child?'' was objected to by defendant's counsel as being a leading question and the judge ruled thus: ''This witness is testifying for the plaintiff and no leading questions should be asked. The question is ordered stricken out.''

Plaintiff's counsel tried to put the question in a different form but defendant still objected. In the meantime, the witness spontaneously said: ''Precisely we spoke of the child.'' The judge said: ''You can not answer.''

The incident continued without plaintiff's counsel succeeding in finding a way satisfactory to the opposing party

and to the court of putting his question. He then asked the witness: "You say that when you met Silvestre Dragoni you addressed him as what?" and the witness answered: "As *compadre.*"—"Why?"—"Because I had sponsored the christening of his . . . ." Defendant's counsel intervened, saying "That is a conclusion . . ." The judge ruled: "Up to the present the godparent relationship has not been established by the fact that he had christened his daughter. It is, therefore, a conclusion and is stricken out."

Plaintiff's counsel went on to examine the witness as to the one hundred dollars: "Why did you tell Dragoni to help that woman?" to which the witness answered: "Because she had told me that the child was the daughter of Dragoni." Whereupon counsel for the adverse party objected. He moved that that part of the testimony be stricken out, and the judge said: "Let it be stricken out, as hearsay evidence." The examination concluded thus: "Attorney Frank Torres: Do you know who is the child's father?—Attorney Hernández Matos: I object.—Judge: Objection sustained. That is to be determined by the court.—Attorney Frank Torres: Do you know whether Silvestre Dragoni made any statement regarding the child Ana María Ortiz during the conversation? —Attorney Hernández Matos: A leading question.—Judge: Sustained. To the attorney: Is this going to last much longer? It is after twelve o'clock. Put the question in a general way and let the witness answer as to the alleged paternity without making conclusions. Counsel is asking leading questions, the other party objects, and the court must sustain the objections.—Attorney Frank Torres: I am through with the witness for the present."

In the afternoon session Marcolina Heredia took the stand. She testified as follows: "I became acquainted with Dolores Ortiz at 160 Mayor Cantera Street and shortly thereafter she gave birth to this little girl. I saw her again when Ana María Ortiz was already eight days old. I had been there

for about ten minutes when Silvestre Dragoni arrived. He then expressed a desire to see his child Ana María Ortiz and went into the room and fondled her. She took her and fondled her . . . into the room of Dolores Ortiz and inquired after his child and fondled her, calling the child 'my daughter,' and said to her: 'my visit will be short, as I have to do some errands.' He placed the child on the bed and took out two dollars which he left to buy food for the child.''

Guillermo Ortiz, a brother of Dolores, the mother of the plaintiff, testified that he knew the defendant, pointing him out in the courtroom. ''I became acquainted with Silvestre Dragoni on the farm of his aunt, María Dragoni, in 1934, in the ward of Maragüez . . . Besides, I think he lived in the same property, and while living there he was my sister's sweetheart, in 1936. Then in the month of July Silvestre Dragoni came to the bungalow at 160 Mayor Cantera and told us that he had a love affair with our sister but that he had in mind to establish her in a house and to continue living with her. . . . On December 26, 1936, our sister came to Mayor Cantera Street, where we live, and told us that she was pregnant by Silvestre Dragoni. Defendant's counsel objected and moved that that testimony be stricken out. The court granted the motion. The witness went on to testify thus: ''Then Silvestre Dragoni, whom I had not seen again until March 29, 1937, when the little girl was born, came eight days afterward to our house. . . . He went in and inquired after the little daughter to whom our sister had given birth; he then went into the room where she was and fondled the child, stayed for a while, and gave my sister two dollars for the child.''

Referring then to the remittance of ten dollars by the defendant to his sister, he answered to the judge: ''There I met my sister-in-law, coming from the house of Rafael Pasarell, and while she was talking to me, Lorenzo Dragoni called her and delivered to her ten dollars sent by Silvestre

for the support of the child and she took the money to her at 160 Mayor Cantera Street where my sister was living.''

The plaintiff's evidence was closed with the testimony of Juan Vázquez. He testified that he knew Dolores Ortiz, and the defendant by sight. Also the child. To the question: ''Do you know whose child is that one?'' he answered that Dolores had called on him with a child. ''I then asked her, 'who is the father?'—'Well, Silvestre Dragoni.' '' Defendant's counsel objected and moved that the matter be stricken out, and the court so ordered. His testimony ended with the statement that he had known Dolores as a single woman living with a sister.

The defendant presented a motion for nonsuit which was denied, thus: ''Counsellor, I think we would save time if we passed upon this question now and let an exception be entered. The court is of the opinion that there has been some evidence, and the jurisprudence of the Supreme Court is to the effect that where there is some evidence the case should be decided on the merits. An exception is entered on your behalf.''

The defendant through his counsel stated that he had no evidence to submit but afterward changed his mind and introduced the testimony of Lorenzo Dragoni, an uncle of the defendant. He testified that he knew Dolores Ortiz. ''When I bought the Maragüez farm she was living in a little house with her father.'' He stated that it was not true that he had delivered in the presence of Guillermo Ortiz the sum of ten dollars for Dolores.

He was asked: ''Do you know whether at any time this woman lived in concubinage, under the same roof. . . . ?'' Plaintiff objected through his counsel and the court sustained the objection. He then answered that he had never heard of the plaintiff and the defendant ''ever having had any love affair''; that the defendant has always lived with him in Maragüez and Montes Llanos; that prior to December 1936,

Dolores Ortiz "lived at my sister's where she used to wash, iron, and cook." She left the house because "sometimes she used to absent herself, going into town and staying there for several days, and she also stayed overnight in the El Tesoro Estate. Her attention was called, she resented it and left."

Such is substantially the evidence introduced by the partties. I agree with the trial judge that it fails to show the existence of concubinage between the plaintiff and defendant, but it does show, in my opinion, that the defendant had had sexual relations with Dolores Ortiz and that as a result thereof the plaintiff was born, which relations he acknowledged at the time to Guillermo Ortiz, Dolores' brother; that he called at the home of the sister of Dolores Ortiz where she was living and where she gave birth to the plaintiff; that a few days after such birth he took the infant in his arms and treated her as his daughter in the presence of Marcolina Heredia, a stranger to the family; that subsequently he met Manuel Borrero, plaintiff's godfather, and upon being addressed by the latter as "*compadre,*" he stated that he had tendered Dolores a certain sum of money which she refused to accept and that he would do no more.

Is the above evidence sufficient for a declaration that the plaintiff was in the uninterrupted possession of the status of a natural child of the defendant? I am compelled to admit that this is one of the weakest cases as to the proof of such status which has been presented to us, and that for this reason my first impulse was to decide the same following the course pointed out in *Delannoy* v. *Heirs of Cividanes,* 53 P.R.R. 108, 113, thus:

"It may be conceded that if this were all, or if the district judge had rendered judgment for plaintiff, the evidence for the plaintiff would have sufficed to sustain such a judgment. It may be conceded that the case as a whole is a border case. In all of the cases upon which appellant relies, however, the evidence was most stronger than in the instant case. See *Cruz* v. *Santiago,* 24 P.R.R. 100; *Montalvo* v. *Montalvo et al.,* 25 P.R.R. 800; *Cruz* v. *Quiñones,* 31 P.R.R. 323;

*Vega* v. *Heirs of Vega*, 32 P.R.R. 548; *Guadalupe* v. *González*, 34 P.R.R. 643; *Colón* v. *Succn. of Tristani*, 44 P.R.R. 163.

"In the first four of these cases judgments for plaintiffs were affirmed. In the fifth and sixth, the evidence was strong enough to satisfy a majority of the court, notwithstanding the contrary view of a minority and of the district judge.

"Cividanes and his mistress and his cousin, Ramón Sobrino, who was also a partner in the liquor business, all lived in the upper story of a house wherein the liquor business was carried on. Sometime before the marriage of Cividanes, his mistress left the island. Her departure was, in fact, it seems, a condition precedent to the contemplated marriage. Sobrino and Cividanes both died before the commencement of the present action.

"Maximina Santiago testified that Ramón Sobrino was also married and living with his wife in the house over the liquor establishment when María Delannoy returned thereto after the birth of her child. Defendants introduced documentary evidence to show that Sobrino was not married after some time in 1897. Maximina had been quite positive in her statement in cross-examination that Sobrino was already married when María Delannoy returned to the house. Aside from this discrepancy, however, she seems to have been a disinterested witness and her testimony withstood the test of cross-examination. It had at times a certain ring of truth which tended to make it somewhat stronger than the testimony of any other witness for plaintiff.

"We shall not attempt to outline the testimony for defendant. It was of necessity negative in character. Nevertheless, the district judge was justified in attaching as he did, considerable importance to the fact that none of Cividanes' closest friends had any knowledge of the fact, if it were a fact, that Agustín Delannoy was his natural son or that Cividanes had treated him as a son. Guayama is not a large town. It was a smaller town in 1896. Cividanes, after the death of his wife, had natural children whom he discussed with his friends, openly acknowledged, and finally legitimated by making their mother his second wife.

"Even after the lapse of nearly forty years, it was a significant fact that among those who knew Cividanes best, no responsible disinterested witness could be found to corroborate the testimony of María Delannoy and her son concerning the alleged acknowledgment of the latter by Cividanes as his natural son.

"We find no such manifest error in the weighing of the evidence as to justify a reversal of the district judge's finding that plaintiff had never been in the continuous enjoyment of the status of a natural child, as required by the law in force at the time of his birth and at the same time of most of the alleged acts relied on as evidence of acknowledgment."

However, I changed my mind when I realized that there is not involved herein a case in which the facts happened forty years ago and the defendant himself and important witnesses were dead, but one where the defendant, being alive, was present at the trial and failed to take the stand, and the basic fact of the plaintiff's being actually the child of the defendant, the issue of his sexual relations with Dolores Ortiz, remains uncontroverted.

In these circumstances, it seems to me that no matter how few the acts of acknowledgment on the part of the defendant might be, and no matter how weak the evidence regarding the same might appear at first view, this court, guided by the spirit of the decision in *Colón* v. *Heirs of Tristani,* 44 P.R.R. 163, 200, should enforce the obligation of the father and consequently, reverse the judgment appealed from and render another instead in favor of the plaintiff.

In *Colón* v. *Heirs of Tristani, supra,* Mr. Justice Córdova Dávila, speaking for the court, said:

"We have studied the decisions of this Supreme Court with reference to the condition as of a natural child. This court in its opinions weighs the elements of proof presented in each case and their probatory value. These opinions are applicable to those cases in which the condition as of a natural child is in issue, independently from the intimate relations existing between the mother and the putative father; but when the sexual relations have been established and the presumption of paternity arises in the mind of the judge, this presumption, corroborated and strengthened by other acts of the father, may be sufficient for obtaining and entering a declaration of natural child. It would be an unjust law that in which, after the existence of a father is shown, the means are not given to compel him to assume the responsibilities contracted with the child by him

engendered. That could not have been the thought of the Legislature; that can not be the spirit of the provisions of section 193 of the Civil Code."

Eight years have since elapsed and the theory which we then held seems to me now still more just: a theory which, in my judgment, should be liberally applied so that the justice that inspired it should attain proper realization.

There should be no fatherless children. The responsibility that binds the man who begets a human being to his offspring should not be eluded. Once his paternity is established and it is shown that the same has been in any way acknowledged by the father, it should not be permitted that selfishness, family connections, or, the serious material and moral consequences generally attaching thereto, should destroy the first spontaneous urge to which nature itself responded, because that first act embodies truth and justice.

As the above is the conclusion I have reached on the facts and the law in the instant case, it is clear that I can not concur in the opinion of the majority, and I dissent.